530 So.2d 688 (1988)
WYETH LABORATORIES, INC.
v.
Billy Joe FORTENBERRY.
No. 57351.
Supreme Court of Mississippi.
July 27, 1988.
Rehearing Denied September 28, 1988.
*689 Thomas A. Bell, Roy A. Smith, Jr., Trudy D. Fisher, Daniel, Coker, Horton & Bell, Jackson, for appellant.
Ralph E. Chapman, Chapman & Heaton, Clarksdale, for appellee.
EN BANC
ANDERSON, Justice, for the Court:
This appeal comes from the Circuit Court of Pike County. Billy Joe Fortenberry, appellee, became seriously ill after receiving a non-swine influenza vaccine, [Influenza Virus Vaccine, Trivalent, Types A & B (1982-83 formula)], manufactured by Wyeth Laboratories, Inc., and administered at the direction of Dr. T.L. Moore, Jr. Fortenberry brought suit against both Dr. Moore and Wyeth for failure to warn. The jury returned a verdict for Dr. Moore and against Wyeth in the amount of $200,000. As explained below, we have no alternative but to reverse and render.
On September 21, 1982, Fortenberry took his wife and two children to Dr. Moore, their family physician of seventeen years, and requested flu shots. Fortenberry, who had not had the shot before, was in good health and had never suffered from any previous allergic reactions.
Dr. Moore, after asking each of the Fortenberrys if they had a cold or any other physical problems and receiving answers in the negative, warned them they might have a sore arm and run a slight fever after receiving the shot. At Dr. Moore's direction, his nurse administered the vaccine to each member of the family.
The vaccine package contained an insert for the prescribing physician warning of possible adverse reactions.[1] One of these was Guillain-Barre syndrome (GBS). Dr. Moore testified that he had received and read the package insert and kept abreast of recent medical literature. He also testified that he believed the risk to be minimal and remote and therefore a warning, which would scare his patients, was not required.
Approximately five days after receiving the shot, Fortenberry began experiencing a burning sensation and weakness in his lower extremities. His condition progressively worsened and resulted in paralysis of the lower extremities, bowel and bladder dysfunction and impotence. He was subsequently diagnosed as having transverse myelitis which "is closely related, in etiology and pathology, to GBS." Unthank v. United States, 533 F. Supp. 703, 722 (D.Utah, 1982), aff'd, 732 F.2d 1517 (10th Cir.1984). Fortenberry was hospitalized for a total of about six weeks. By the time of the trial, his condition had improved. He was no longer paralyzed, but he was still impotent and incontinent. His wife and children did not become ill.
At trial, a biochemist testifying on behalf of Fortenberry stated with medical certainty that there existed a causal relationship between the vaccine and Fortenberry's illness. Several medical doctors testifying on behalf of Wyeth denied the existence of *690 any causal relationship.[2]

I.
Wyeth raises the question of whether Dr. E.H. Eylar, a biochemist, was competent to render an opinion as to medical causation although not a medical doctor. It was recognized recently by this Court in a workers' compensation proceeding that "`medical causation' is no more than causation in fact." Sonford Products Corp. v. Freels, 495 So.2d 468, 472 (Miss. 1986). (Biochemist/toxicologist qualified to give opinion regarding causal relationship between exposure to chemicals containing pentachlorophenol and death of claimant.) This rationale was extended to a medical malpractice action in Thompson v. Carter, 518 So.2d 609 (Miss. 1987) where it was held that a pharmacologist/toxicologist was competent to testify concerning the effect of Bactrim on the human body. Therefore, the inquiry is whether Dr. Eylar possessed knowledge or training enabling him to render an opinion regarding the causal relationship between the vaccine and Fortenberry's disease.
"A witness may qualify as an expert based on his knowledge, skill, experience, training, education or a combination thereof. Qualification as an expert does not necessarily rest upon the educational or professional degree a witness possesses." Thompson, 518 So.2d at 614; Sonford, 495 So.2d at 473; Hall v. Hilbun, 466 So.2d 856, 873 (Miss. 1985). Dr. Eylar received his Ph.D. in biochemistry from Harvard Medical School. Among his other credentials, he has served as a Professor of Immunology at the University of South Carolina at Charleston, Professor of Biochemistry at the University of Toronto, and Director of the Department of Experimental Biology at the Merck Institute. He has published, or participated in, approximately 140 articles dealing with biochemistry and immunology. At the time of trial he was a Professor of Biochemistry at the Ponce School of Medicine in Puerto Rico where he was also conducting immunological research as Director of the Biomedical Research Program.
Once the trial judge has determined that expert testimony will be of assistance to the trier of fact the determination of whether a particular witness is qualified as an expert is a matter within his discretion. Mississippi Farm Bureau Mutual Ins. Co. v. Garrett, 487 So.2d 1320 (Miss. 1986). The trial judge did not abuse his discretion in allowing Dr. Eylar to testify as an expert as to his opinion regarding the causal connection between the vaccine and Fortenberry's disease.

II.
Wyeth also argues that Fortenberry failed to prove causation.
It was proven that the swine flu vaccine given during the 1976-77 flu season caused a much higher incidence of GBS and related disorders. Numerous suits brought against the government arose out of that mass immunization. The vaccine in the case at bar is a non-swine vaccine made with a different formula. Its causal relationship to GBS was seriously disputed.
Dr. Eylar testified that his studies and research indicated the presence of a common link between the swine and non-swine flu vaccines; to-wit the presence of chicken P-2 protein in the blood of persons who contracted GBS. Both vaccines are grown in chicken egg embryos and then extracted.
At trial no fewer than five experts rejected or refuted Eylar's study and testified regarding current medical literature and studies which, in their opinion, disproved any causal connection between the vaccine and these diseases. According to these experts, the incidence of GBS (1.7 out of 100,000) is no higher in persons who have had the vaccine than in persons who have not.
*691 While there was considerably more expert testimony against a causal connection, that the jury chose to believe expert testimony to the contrary is not sufficient ground for relief on appeal. Mississippi Farm Bureau Mutual Ins. Co., 487 So.2d at 1327.
Causation is more than just cause-in-fact. Proximate, or legal cause, must be proven. W. Keeton, Prosser and Keeton on The Law of Torts, sec. 41 (5th ed. 1984). "[T]he primary function of the jury is the determination of questions of fact upon which reasonable persons might differ." W. Keeton, Prosser and Keeton on The Law of Torts, sec. 45 at 319-20 (5th ed. 1984). Assuming arguendo that the warning was inadequate, Fortenberry still had the burden of showing that an adequate warning would have altered Dr. Moore's conduct. Plummer v. Lederle Laboratories, 819 F.2d 349, 358-59 (2d Cir.), cert. den., ___ U.S. ___, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); Stanback v. Parke, Davis & Co., 657 F.2d 642, 646 (4th Cir.1981); Lindsey v. Ortho Pharmaceutical Corp., 637 F.2d 87, 92 (2d Cir.1980); Goodson v. Searle Laboratories, 471 F. Supp. 546, 548 (D.Conn. 1978); Dunkin v. Syntex Laboratories, Inc. 443 F. Supp. 121, 124 (W.D. Tenn. 1977); Felix v. Hoffman-LaRoche, Inc., 513 So.2d 1319, 1321 (Fla.App. 1987). The Eighth Circuit in determining this issue in a similar factual pattern stated: "When viewed in a light most favorable to plaintiff, there simply is no evidence that Dr. Murphy did not know of the danger in using radiation therapy. On the contrary, the only evidence is that he had such knowledge. Any failure to warn by Picker would not have been the proximate cause of Kirsch's injuries." Kirsch v. Picker International, Inc., 753 F.2d 670, 672 (8th Cir.1985). The record contains no testimony showing that Dr. Moore would not have administered the flu shot if adequate warning had been given. His testimony unequivocally established that he read the warning on the package insert and decided not to warn the Fortenberrys. But it is not necessary for us to determine whether Dr. Moore's conduct would have been altered since we hold the warning was adequate as a matter of law.

III.
We hold that the drug manufacturer has a duty to adequately warn the prescribing physician of any known adverse effects which might result from use of its prescription drugs. Swayze v. McNeil Laboratories, Inc., 807 F.2d 464 (5th Cir.1987). The dispositive question here is whether the warnings given by Wyeth were sufficient to warn Dr. Moore of possible complications.
The general rule is "that where prescription drugs are concerned, a manufacturer's duty to warn only extends to physicians and not to laymen." Swayze, 807 F.2d at 470. "If the language of the warning is adequate then the drug manufacturer ordinarily is freed from liability." Swayze, 807 F.2d at 469. The "learned intermediary" doctrine is the basis for this rule. Swayze, quoting Reyes v. Wyeth Laboratories, 498 F.2d 1264 (5th Cir.), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), stated:
We cannot quarrel with the general proposition that where prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use... . As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient... . The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between the manufacturer and consumer. 498 F.2d at 1276 (emphasis in original). This rule has been reaffirmed in Timm v. Upjohn Co., 624 F.2d 536, 638 (5th Cir.1980), cert. denied, 449 U.S. 1112, 101 *692 S.Ct. 921, 66 L.Ed.2d 840 (1981), and Mauldin v. Upjohn Co., 697 F.2d 644, 647 (5th Cir.), cert. denied, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983).
807 F.2d at 470.
If there is no physician in the role of "learned intermediary" then the drug manufacturer has a duty to adequately warn the consumer. Swayze, 807 F.2d at 470; Reyes, 498 F.2d 1264; Givens v. Lederle, 556 F.2d 1341 (5th Cir.1977); Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir.1968).
The issue of a warning's adequacy is factual and usually will be resolved by the trier of fact. Graham v. Wyeth Laboratories, Inc., 666 F. Supp. 1483, 1498 (D.Kan. 1987). See also, Hahn v. Sterling Drug, Inc., 805 F.2d 1480 (11th Cir.1986); Mauldin v. Upjohn Co., 697 F.2d 644 (5th Cir.) cert. den. 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983); Timm v. Upjohn Co., 624 F.2d 536 (5th Cir.1980) cert. den. 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981). This precise question has not yet been ruled on by this Court but there are many analogous cases. See, e.g., Pargo v. Electric Furnace Co., 498 So.2d 833 (Miss. 1986) (furnace with non-obvious defect); Parmes v. Illinois Central Gulf Railroad, 440 So.2d 261 (Miss. 1983); (height clearance at overpass); Bush Construction Co., Inc. v. Blakeney, 350 So.2d 1370 (Miss. 1977) (road construction site); City of Jackson v. Sullivan, 349 So.2d 527 (Miss. 1977) (same). Expert testimony may be necessary to assist the trier of fact to understand the evidence or determine a fact in issue when the issue presented requires scientific, technical or other specialized knowledge. Thompson, 518 So.2d at 614; Anchor Coatings, Inc. v. Marine Indus. Res. Insul., Inc., 490 So.2d 1210, 1217 (Miss. 1986); Hardy v. Brantley, 471 So.2d 358 (Miss. 1985).
The adequacy of a warning addressed to the medical community may fall into the category of issues requiring expert testimony. "Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect." Reyes, 498 F.2d at 1276. "The terms and applications of a warning on such a drug, in order to have meaning, must be explained to the jury. This is a subject `so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman.'" Dion v. Graduate Hospital of the Univ of Pennsylvania, 360 Pa.Super. 416, 425, 520 A.2d 876, 881 (1987) (citing McCormick on Evidence 33 (E. Cleary, 3rd ed. 1984). Where the adequacy of the warning is not obvious to the ordinary layperson it is necessary to have expert testimony as to this issue.
An adequate warning is one reasonable under the circumstances. Swayze v. McNeil Laboratories, Inc., 807 F.2d 464, 471 (5th Cir.1987); Phelps v. Sherwood Medical Industries, 836 F.2d 296, 303 (7th Cir.1987); Plummer v. Lederle Laboratories, 819 F.2d 349, 356 (2d Cir.1987); Brochu v. Ortho Pharmaceutical Corp., 642 F.2d 652, 657 (1st Cir.1981); Johnson v. Husky Industries, Inc., 536 F.2d 645 (6th Cir.1976); Basko v. Sterling Drug, Inc., 416 F.2d 417, 426 (2d Cir.1969); Sterling Drug, Inc. v. Yarrow, 408 F.2d 978, 992-93 (8th Cir.1969); Graham v. Wyeth Laboratories, 666 F. Supp. 1483, 1498 (D.Kan. 1987); Felix v. Hoffman-LaRoche, Inc., 513 So.2d 1319, 1320-21 (Fla.App. 1987); Leesley v. West, 165 Ill. App.3d 135, 116 Ill.Dec. 136, 518 N.E.2d 758, 761 (1988). Several cases have held that a package insert may be sufficient for the warning to be adequate as a matter of law. Hurley v. Lederle Laboratories, 651 F. Supp. 993, 1002 (E.D.Tex. 1986). See also, Plummer v. Lederle Laboratories, 819 F.2d 349, 357 (2d Cir.1987); Chambers v. G.D. Searle & Co., 441 F. Supp. 377 (D.Md. 1975), aff'd per curiam, 567 F.2d 269 (4th Cir.1977); F. Harper, F. James & O. Gray, The Law of Torts, sec., 28.7, nn. 27-29 (2d ed. 1986 and Supp. 1987).
The package insert involved has been thoroughly examined and the most relevant passages have been reproduced in a footnote in this opinion. It is clear from the record that Fortenberry was in that group of "healthy adults" for whom the vaccine was not recommended. It was recommended for those "who are at increased *693 risk of adverse consequences from infections of the lower respiratory tract." The insert went on to warn physicians that although the connection between the vaccine and GBS was not clear, persons considering the vaccine "should be made aware of the benefits and possible risks, including GBS, of administration."
Dr. Moore testified that he kept abreast of the medical literature and did not believe there was a sufficient connection between the vaccine and GBS to warrant a warning. He decided to give no warning to the Fortenberrys.
It is the holding of this Court that the warning was adequate as a matter of law and that Dr. Moore functioned as a learned intermediary. Application of the learned intermediary doctrine, adopted in this opinion, prevents liability from being found against Wyeth. We reverse the decision of the lower court and render a verdict for Wyeth. The jury verdict for Dr. Moore is not before this Court as part of this appeal.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] Some of the language in the package insert supporting the determination that the warning to Dr. Moore was adequate as a matter of law follows:

"INDICATIONS AND USAGE
* * * * * *
Annual routine influenza immunization is NOT recommended for healthy adults, infants, or children but is strongly recommended for all persons, children and adults, who are at increased risk of adverse consequences from infections of the lower respiratory tract.
* * * * * *
ADVERSE REACTIONS
* * * * * *
3. Guillain-Barre syndrome (GBS). This is an uncommon illness characterized by ascending paralysis which is usually self-limiting and reversible... . Before 1976, no association of GBS with influenza use was recognized... . A statistically significant excess risk of contracting GBS after receipt of the 1978-79 or 1979-80 Influenza Virus Vaccine could not be demonstrated... . Nevertheless, candidates for Influenza Virus Vaccine should be made aware of the benefits and possible risks, including GBS, of administration.
Other neurologic disorders, including encephalopathies, not defined as GBS, have been temporally associated with influenza vaccination.
[2] Unthank v. United States, 533 F. Supp. at 719 cited a medical article referring to GBS "as an `all-encompassing phrase' which includes a variety of symptoms, including transverse myelitis." See also McDonald v. United States, 555 F. Supp. 935, 942-57 (M.D.Penn. 1983) (Discussion of the expert testimony of the relationship between GBS and transverse myelitis where the Defendant's position was the plaintiff suffered from transverse myelitis and not GBS.).