912 So.2d 1101 (2005)
Norman G. HARRIS, Individually and as Guardian of the Estate and Person of Davey L. Harris, Appellant
v.
INTERNATIONAL TRUCK AND ENGINE CORPORATION f/k/a Navistar International Transportation, Appellee.
No. 2004-CA-00851-COA.
Court of Appeals of Mississippi.
October 18, 2005.
*1103 William B. Weatherly, D. Briggs Smith, Batesville, attorneys for appellant.
W. Scott Welch, Leann Mercer, Jackson, Margaret Sams Gratz, attorneys for appellee.
Before KING, C.J., IRVING and BARNES, JJ.
IRVING, J., for the Court.
¶ 1. Norman Harris filed an action against International Truck and Engine Corporation (International), alleging that he and Davey Harris suffered severe injuries while driving an International Harvester Scout II (Scout).[1] After discovery, International filed a motion for summary judgment against Harris, which the trial court granted. Harris now appeals the entry of the summary judgment order and raises the following issues on appeal: (1) whether the trial court erred in not allowing a heeding presumption that adequate instructions would have been read and heeded; (2) whether the trial court erred in finding that the causation requirement for products liability was not satisfied when there were chisel marks on the Scout's axle and International's service manual instructed mechanics to use a chisel procedure; (3) whether the trial court erred in refusing to allow the jury to infer that adequate instructions would have been heeded; and (4) whether the trial court erred in finding that circumstantial evidence of causation should not have gone to the jury. International responds that the trial court properly found that Harris failed to show any genuine issue of material fact concerning causation, a necessary element of his products liability claim. We agree and affirm the holding of the court below.

FACTS
¶ 2. On April 23, 1995, Davey Harris was driving his Scout home from work when the left rear axle of the Scout snapped, causing the vehicle to overturn. Norman Harris, Davey's brother, was a passenger in the truck at the time. Norman Harris suffered some injuries, and Davey Harris was left a quadriplegic as a result of the accident. Davey Harris was not the original owner of the Scout, which was about fifteen years old when he purchased it in 1993.
*1104 ¶ 3. At the time of the accident, the Scout was equipped with a straight roller bearing manufactured by Bower. It was established in the trial court that when the vehicle was manufactured in 1979 it contained a tapered roller bearing manufactured by Timken. Therefore, the original Timken bearing was removed and replaced between 1979, when the vehicle was manufactured, and 1995, when the accident occurred. No evidence was presented as to who replaced the bearing, when it was replaced, how many times it had been replaced, or whether the individual replacing the bearing had used the International service manual when removing the bearing for replacement.
¶ 4. The owner's manual that came with the Scout suggested that the owner take the vehicle to a certified International mechanic if there was a problem with the bearing of the vehicle. Nothing in the owner's manual explained how to replace or remove the bearing, but there was a separate service manual distributed to mechanics that provided instructions.[2] The instructions in this service manual gave a specific process for removing the bearing on the vehicle's axle: first, the mechanic was to remove the retainer ring by cutting part-way through it with a cold chisel while being careful not to cut through to the axle and second, the mechanic was instructed to use a press to remove the actual bearing.

STANDARD OF REVIEW
¶ 5. In determining whether the entry of summary judgment in a case is proper, this Court reviews the decision of the trial court de novo and makes its own determination on the motion. Lowery v. Guar. Bank and Trust Co., 592 So.2d 79, 81 (Miss.1991). We review all the evidence from the court below, including pleadings, depositions, interrogatories, admissions, and filed affidavits. This evidence is viewed in a light most favorable to the non-moving party. Id. Summary judgment should only be granted when there is no genuine issue of material fact. Id. If no genuine issue exists, then the moving party is entitled to judgment as a matter of law. Id. The burden is on the party moving for summary judgment to prove that no genuine issue of material fact exists; "the non-movant should be given the benefit of the doubt." McMillan v. Rodriguez, 823 So.2d 1173, 1177(¶ 9) (Miss.2002). If one party swears to one version of events and the opposing party swears that the opposite is the truth, there are issues of fact sufficient to deny a motion for summary judgment. Id.

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 6. Although Harris has submitted four separate issues, they may be properly addressed by recasting them into two general issues regarding causation and the appropriateness of applying a heeding presumption. Therefore, we recast the issues accordingly.

(1) Causation
¶ 7. Under Mississippi products liability law, in order to obtain relief for a defective product, a plaintiff must prove that the product was a proximate cause of the plaintiff's injuries. Miss.Code Ann. § 11-1-63(a)(iii) (Rev.2002). In the present case, it is clear that the axle that failed, whether original or not, had undergone some changes since it left International in 1979. To succeed on his products *1105 liability claim, Harris must show that the allegedly defective axle was in substantially the same condition at the time of the accident as when it left the manufacturer. Wolf v. Stanley Works, 757 So.2d 316, 319(¶ 10) (Miss.Ct.App.2000).
¶ 8. As we understand Harris's argument, it is not that the original axle, standing alone, was defective but that the instructions supplied by International for removing the bearing on the axle caused the axle to be defective because removing the bearing pursuant to the supplied instructions would inevitably result in chisel gouges or indentations in the axle which in turn would cause undue heat being applied to the axle as a result of reduced interference fit, ultimately leading to its failure. Harris also argues that the failure of International to provide "cleanup instructions" after removal of the bearing or to utilize alternative safer procedures for removing the bearing made the supplied instructions and axle defective.
¶ 9. Specifically, Harris argues that the service manual provided inadequate and dangerous instructions because it instructed a mechanic to remove the retainer ring with a cold chisel, a process which Harris argues is inherently dangerous. Harris also maintains that the owner's manual is defective for failing to provide instructions on procedures to follow post removal of a bearing, including instructions (1) for proper deburring to remove nicks, marks or indentations in the axle shaft, (2) for checking the diameter of the axle shaft to ensure proper interference fit of the new bearing to be stalled, and (3) for inspecting the axle shaft for bluing or heat damage. If Harris can show that a defect exists in the instructions in either of the manuals, he need not go further and show that the axle itself was in substantially the same condition as when it left International because there is no dispute that the manuals are the original manuals issued by International, and the manuals, along with the axle, constitute the product that is claimed to be defective.
¶ 10. However, Harris must show that the defective product was a proximate cause of his injuries. Basically, Harris must show that someone used the International manuals and, as a result, Norman and Davey Harris were injured. No evidence was offered below as to who replaced the bearing, when it was replaced, how it was replaced, how many times the bearing had been replaced, and whether or not the International service manual was relied on in doing so. Harris recognizes that he has not produced any direct evidence showing that the person who replaced the bearing followed the instructions in the manual provided by International. However, Harris believes that he presented enough circumstantial evidence on the issue of causation to avoid summary judgment being rendered against him. Stated another way, Harris believes that he presented strong circumstantial evidence that the instructions in International's manuals were in fact followed and that nevertheless, he and Davey were injured.
¶ 11. It seems to us that the instructions in either the owner's or service manual or in both manuals were not followed. The fact that gouge or chisel marks may have been found on the axle shaft does not in the least prove that they were placed there by an individual or certified International mechanic attempting to remove the bearing retainer by using a cold chisel. Such a conclusion would be based on mere speculation and, assuming the bearing was replaced by a certified International mechanic, would compel the conclusion that the certified International mechanic was incompetent and incapable of performing the procedure which he was trained to do. *1106 And if the marks were placed there by someone other than a certified International mechanic, it would mean that the owner of the Scout II, at the time of the bearing replacement, did not follow the suggestion in the owner's manual to take the vehicle to a certified International mechanic. In either case, Harris's injury would be the result of someone not following the instructions provided by International in the manuals.
¶ 12. As to Harris's circumstantial evidence claim, we note first that the record fails to reflect any instance where Harris made a request to introduce circumstantial evidence and was denied the opportunity to do so. In fact, Harris believed that he had presented circumstantial evidence that helped prove that whoever removed the bearing and replaced it did so by following the International manual. This evidence consisted primarily of the existence of marks on the axle, coupled with testimony from expert witnesses as to how those marks might have come to be on the axle. In the discussion which follows, we address the fallacy in Harris's contention that summary judgment was improper because his circumstantial evidence raised genuine issues of material fact.
¶ 13. There was testimony from Richard McSwain, one of Harris's experts, that marks on the axle had the appearance of chisel marks. However, Charlie Miller, another Harris expert, testified that marks on the axle could just as easily be made by someone removing the bearing with a drill and punch or Dremel tool. James Shuman, one of International's experts, testified in his deposition that the marks could have come from someone dropping the axle or from the use of a puller in removing the bearing. Regardless of the inability of even his own experts to conclusively say that the marks came from an improperly used chisel, Harris maintains that these marks are evidence that should go to a jury because they potentially show: (1) that a chisel was used on the vehicle to get the retainer ring off; (2) the chisel must have been used because the International service manual said to use a chisel; and (3) the chisel caused marks on the axle that were then improperly deburred, leading to the failure of the axle when Davey Harris was driving his Scout in 1995. Harris argues that this theory represents a genuine issue of material fact, and therefore International's motion for summary judgment should not have been granted. We disagree.
¶ 14. In order to be successful, Harris must show that his theory of the case is based on more than speculation, because juries must base their verdicts on something more than mere speculation or possibilities. Denman v. Denman, 242 Miss. 59, 67-69, 134 So.2d 457, 460-61 (1961). The evidence presented by Harris provides nothing more than grounds for speculation as to the cause of the marks on the axle, and further speculation as to whether those marks were caused by someone following International's manual, and even further speculation about whether the marks could have led to the injuries suffered by Harris and his brother.
¶ 15. It seems to us that the evidence offered by Harris proved only that International's service manual instructed that a cold chisel be used to remove the bearing retainer ring, that nicks or marks were discovered on the left axle shaft of the Scout in the area where the axle broke, and that the nicks or marks could have been made by one or more instrumentality by one or more unidentified individuals. Harris then reasons that a genuine issue of material fact is presented as to whether the nicks or marks were caused by someone following International's instructions. In other words, the nicks or marks ipso *1107 facto prove the existence of a genuine issue of material fact. That is not the law. Harris was required to prove, by evidence other than the mere existence of the nicks or marks, that a genuine issue of fact existed as to whether International's defective product (the instructions) caused the nicks or marks. Harris failed to meet his burden of proof unless that proof can be based on mere speculation. It cannot.
¶ 16. We see no need to address Harris's argument that International failed to provide instructions for post-bearing removal because this argument is predicated upon the notion that the nicks and marks were caused by an individual removing a bearing pursuant to International's instructions. As we have already mentioned, Harris's evidence on the underlying cause of the nicks and marks falls woefully short of creating a genuine issue of material fact. In other words, since Harris did not prove that the nicks and marks were caused by the instructions that International did provide, there is no need to discuss additional instructions to remedy a situation which the proof fails to show was created by the alleged faulty instructions. As such, we find no genuine issues of material fact sufficient to escape summary judgment on the issue of causation.

(2) Failure to Warn and Heeding Presumption
¶ 17. Harris also argues that the axle was defective because of the failure of International to provide adequate warnings regarding the serious consequences of: (1) a reduced axle diameter, (2) removing too much material from the axle shaft, (3) improper interference fit resulting in heat damage, and (4) improper deburring.
¶ 18. As to this claim, Harris acknowledges that he has the burden of showing that if an adequate warning or instruction had been given, it would have been read and followed, and thereby prevented the injuries to him and his brother. To satisfy his burden in this regard, Harris urges us to adopt a presumption that if an adequate warning had been given, it would have been read and heeded. Such a presumption would, according to Harris, operate to "assist consumers in proving causation."
¶ 19. We first observe that the presumption has generally been adopted in circumstances where either an inadequate warning or no warning was given in unavoidably, unsafe prescription drug cases. Reyes v. Wyeth Labs., 498 F.2d 1264 (5th Cir.1974).[3] In such cases, the plaintiff has the burden of proving that an adequate warning would have prevented his or her physician from prescribing the medication, thus preventing his or her injuries. Wyeth Labs., Inc. v. Fortenberry, 530 So.2d 688, 691 (Miss.1988). In an effort to meet this high burden, the argument is made that if an adequate warning is given, a presumption should arise that the consumer will read and heed the warning. This argument is premised on the comments made to section 402A of the Restatement (Second) of Torts. Comment J to section 402A states in pertinent part that "[w]here warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not *1108 in defective condition, nor is it unreasonably dangerous." Thomas v. Hoffman-LaRoche, Inc., 949 F.2d 806, 814 (5th Cir. 1992). If the manufacturer may reasonably assume that a given warning will be read and heeded, is not a plaintiff entitled to the same presumption in cases where the warning was not given? In other words, should not the plaintiff be entitled to assume, without having to prove, that had an adequate warning been given, it would have been read and followed?
¶ 20. The Reyes court, applying Texas law and relying upon Technical Chemical v. Jacobs, 480 S.W.2d 602, 606 (Tex.1972) and Hoover & Son v. O.M. Franklin Serum Co., 444 S.W.2d 596 (Tex.1969), held that in Texas when a consumer is injured by a product which is sold without a required warning, a rebuttable presumption will arise that the consumer would have read any warning provided by the manufacturer, and acted so as to minimize the risks and that, in the absence of evidence rebutting the presumption, the manufacture may be held liable if the injury was foreseeable.
¶ 21. If the warning given is adequate, there is no need to further address the issue of causation because a manufacturer is not liable for any injuries stemming from a product bearing such a warning, which is safe for use if the warning is followed. Such a product is neither defective nor unreasonably dangerous. Thus, Harris's entire argument necessarily is premised on the assumed fact that inadequate warnings were given regarding the product. We have already rejected this assumption. Here, the owner's manual suggests that the owner take the Scout II to a trained International mechanic. While the owner's manual does not warn the consumer of any consequences of not taking the Scout to a trained mechanic, it is common sense that implicit in this instruction is a warning that the repair tasks are beyond the consumer's ability to perform and that if such an attempt is made, dire consequences could result. Moreover, there is no contention that Harris himself replaced the bearing on the Scout II or that any of his predecessors in title personally replaced the bearing. Therefore, any assertion that additional instructions or warnings in the owner's manual would have prevented the accident and the Harrises' resultant injuries makes no logical sense.
¶ 22. Even if we were to presume an inadequacy in this regard, Harris still would be required to prove that he followed the given instructions in removing the bearing but nevertheless was injured. There is absolutely no evidence that either Harris or any of his predecessors in title performed any work on the Scout II.
¶ 23. As previously noted, the service manual provides a procedure for removing the bearing, but it does not warn of the consequences of improper removal nor does it provide post removal procedures to be undertaken before installing a new bearing. However, if the prescribed procedure for removal is adequate, there is no need for any other warning because the axle would not be defective or unreasonably dangerous. Harris strenuously argues that the prescribed removal procedure was inadequate, and produced an expert who opined that another safer procedure should have been utilized. However, it is noteworthy that none of Harris's experts stated that the nicks or marks on the axle shaft could not have been avoided by one utilizing International's instructions. Of course, this statement assumes that the nicks and marks were made as a result of one following International's instructions.
*1109 ¶ 24. We are at a loss to understand Harris's argument that the prescribed removal procedure could not be followed by a trained mechanic without causing damage to the axle shaft. It is indeed the function of a trained mechanic to perform tedious and delicate tasks that an ordinary layman cannot. Assuming arguendo that the prescribed removal procedure was inadequate, Harris nevertheless has failed to prove that if adequate instructions and warnings had been given, he and the International service mechanic would have read and heeded them. To overcome this deficiency in the evidence, Harris urges us to read Thomas as sanctioning the creation of a heeding presumption in cases such as his.
¶ 25. In Thomas, the Fifth Circuit declared:
Furthermore, in attempting to predict the likely course that Mississippi law will take, we recognize that there are two very different types of warnings that might be associated with a particular product: (1) an unavoidable risk warning; and (2) a preventable risk warning. . . . The second type of warning is customarily associated with mechanical products, and details risks that can be avoided by using the product in a certain manner. . . . Because the precautions [in the second type of warnings] are typically minimal . . . we have little trouble with a rebuttable presumption that a reasonable product user will choose to use the product safely.
Thomas, 949 F.2d at 813. This language is mere dicta which this Court is not bound by in any way. Even if this passage did constitute binding precedent, it would have no applicability to this case. When the Fifth Circuit discussed the preventable risk warning, it was referring to straightforward warnings on a product intended for consumers.[4]Id. It was not referring to warnings intended for professionals. The warnings which Harris contends should have been given in this case but were not given involved technical matters: the serious consequences (1) of a reduced axle diameter, (2) of removing too much material from the axle shaft, (3) of improper interference fit which can result in heat damage, and (4) of improper deburring. This is a very different situation from the one envisioned by the Thomas court.
¶ 26. Moreover, the Mississippi Supreme Court had a perfect opportunity to adopt a heeding presumption in Fortenberry, but apparently declined to do so. In Fortenberry, the plaintiff alleged that he had been harmed by a flu vaccine given to him by a doctor. Fortenberry, 530 So.2d at 689. Although the Fortenberry court found that the warning in Fortenberry was adequate, the court went further and stated, "Assuming arguendo that the warning was inadequate, [the plaintiff] still had the burden of showing that an adequate warning would have altered [the doctor's] conduct." Id. at 691. Thus, when faced with the exact situation in which the heeding presumption is meant to apply, the Mississippi Supreme Court chose not to apply the presumption and instead explicitly placed on the plaintiff the burden of proving that the allegedly inadequate warnings had been followed. The fact that our supreme court has ruled on cases where a heeding presumption could easily have been applied to aid the plaintiff in a products liability case and declined to do so indicates to us that the Mississippi Supreme Court has no intention or desire to adopt or create a heeding presumption as *1110 a part of our jurisprudence with respect to product liability cases. Therefore, we decline to create one as well.
¶ 27. In the alternative, Harris argues that the trial court erred in granting International's motion for summary judgment because the jury "should have been allowed to infer that proper warnings would have been read and heeded." We find this to be no different in substance from asking us to create a heeding presumption, which request we have already rejected.
¶ 28. The dissent relies heavily on the deposition testimony of McSwain to argue that a reasonable jury could find that the instructions given in the service manual "were inadequate and rendered the Scout unreasonably dangerous." There are several problems with this conclusion. First, McSwain was an expert only as related to metallurgy. McSwain admitted repeatedly that he had little experience as a mechanic and deferred to the opinion of Miller, Harris's expert mechanic witness. Thus, portions of the testimony of McSwain concerned areas that McSwain had little to no personal knowledge of (such as the difficulty in using a chisel to remove a retainer ring, a process that McSwain had never undertaken). Second, nothing in McSwain's testimony overcomes the simple fact that the instructions provided in International's service manual were adequate. The instructions specifically instructed: "Using a sharp cold chisel, cut retainer ring. Chisel only enough to split ring to avoid damaging axle shaft." The manual then goes on to instruct the removal of the actual bearing with an arbor press, not a chisel. These instructions were adequate. A mechanic would have had to ignore these instructions in order to damage the axle with the chisel.
¶ 29. The dissent also argues that this case should go to a jury under the reasoning of Mack Trucks, Inc. v. Tackett, 841 So.2d 1107 (Miss.2003). In that case, two trucks, with engines running, were uploading gasoline to an aboveground fuel storage tank. One of the trucks exploded, and then a second explosion occurred. The plaintiff's decedent's was killed as a result of the explosions. The plaintiff sued, among other persons, the makers of the engines of both of the trucks on a theory that one or both of the engines caused the fire as a result of their ingesting volatile fumes, causing their engines to run away. Id. at 1110(¶ 7). The plaintiff claimed that both of the trucks "were defectively designed because they did not contain an automatic shutoff device and that the trucks's air intake systems should have been fitted with a safety device which would close it off if the engine exceeded a certain speed." Id. at 1110(¶ 6). The plaintiff's expert claimed that the explosions occurred because the engines of both trucks "`spun up' after ingesting gasoline vapors through the air intakes" and that "one of the engines . . . caused the fire by running away, overheating its exhaust pipe, and probably blowing flames through the exhaust igniting the gasoline." The plaintiff's expert also testified that engines of both trucks "were unreasonably dangerous for the environment that they were in." Id. at 1110-11(¶ 8). The engines manufacturers defendants claimed that neither engine was defectively designed and offered other explanations by experts for the cause of the explosions and fire. Id. at 1111(¶ 10). On appeal, the Mississippi Supreme Court held that a battle of the experts provided sufficient evidence to support the jury's verdict. Id. at 1112(¶ 20).
¶ 30. Tackett does not require a different result in our case because it is not a summary judgment case. There was no question that one or both of the trucks exploded, and neither truck manufacturer *1111 alleged that either of the truck engines was defectively designed or was the cause of the explosion and fire.
¶ 31. In Tackett, the explosion and fire occurred while both truck engines were running; therefore, it was clear that one or both of the trucks' engines caused the fire. In our case, even after reviewing all the evidence produced in the light most favorable to Harris, we cannot say that it is clear, or that there is a genuine issue of material fact, that International's instructions or failure to warn regarding post-bearing removal inspection and replacement procedures caused the accident and the Harrises' injuries. But even if, as the dissent contends, the expert testimony in this case created a jury issue, Harris still faces the hurdle of proving that had a proper warning been given, it would have been heeded and followed, since he alleges that the accident was caused by International's failure to warn of the consequences of not properly (1) deburring the axle, (2) inspecting the axle shaft for heat damage, and (3) ensuring proper axle diameter for acceptable interference fit. The dissent's contention that Fortenberry stands for the proposition that the jury would have been entitled to presumed that adequate instructions or warnings would have been followed is misplaced. Fortenberry, stands for exactly the opposite proposition.

CONCLUSION
¶ 32. For the reasons discussed above, we find that the trial court did not err in granting summary judgment in favor of International. Harris failed to show any genuine issue of material fact that would allow him to escape summary judgment.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT IS HEREBY AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION.
CHANDLER, J., Dissenting.
¶ 34. I respectfully dissent from the majority's decision to affirm the grant of summary judgment to International. I believe that the evidence submitted by Harris created genuine issues of material fact as to whether faulty instructions in International's service manual proximately caused the injuries of Harris and his brother. Therefore, I would reverse the grant of summary judgment and allow this case to proceed to trial.
¶ 35. A plaintiff desiring to establish a manufacturer's liability for injuries caused by a product's inadequate warnings or instructions must show the following elements: (1) that the product was defective at the time it left the manufacturer (2) due to inadequate warnings or instructions (3) that rendered the product unreasonably dangerous, (4) proximately causing (5) damages. Miss.Code Ann. § 11-1-63(a) (Supp.2004). The plaintiff must prove each of these elements by a preponderance of the evidence. Id. On review of the grant of a motion for summary judgment, we must take the evidence of the nonmovant as true, along with all favorable inferences that reasonably may be drawn from the evidence. Harris v. Shields, 568 So.2d 269, 275 (Miss.1990).
¶ 36. In my opinion, taking Harris's evidence as true, a jury could reasonably find that the Scout was repaired according to inadequate instructions contained in International's service manual and that this repair created conditions leading to the *1112 axle's ultimate failure. Harris's accident occurred when the Scout's left axle fractured, causing the wheel to fall off and the truck to overturn. International admitted that the axle fractured because it had suffered heat damage. An expert witness for International, Timothy Cheek, stated that the heat damage was located underneath the left wheel bearing. It was undisputed that this bearing had been replaced at some point in the past. The replacement bearing used was an authorized replacement part for the Scout.
¶ 37. The majority finds that the Scout's owner's manual suggested that the owner take the Scout to a certified International mechanic to replace a bearing. The majority concludes that Harris's evidence is insufficient because he cannot show the bearing was replaced by a certified International mechanic as per the suggestion in the manual. I would hold that Harris did not need to show that the bearing was replaced by a certified International mechanic. As admitted by the majority, the manual merely encourages the Scout owner to take the Scout to an International mechanic for repairs. The manual states:
For information not given in this manual, or if you require services of a trained serviceman, we urge you to contact an IH dealer in your locality. IH dealers keep abreast of the latest methods in servicing IH equipment, and have up-to-date facilities for providing prompt, first-class service.
Significantly, the last page of the owner's manual allows the owner to purchase an International service manual for the Scout by mail for $12.50. Thus, the owner's manual does not require the owner to take the Scout to a certified International mechanic for repairs but, in fact, contemplates that a Scout owner might purchase his own service manual and follow the service manual to conduct repairs himself. International Truck employee Charles Powell testified in reference to this provision that International was aware that many Scout owners performed repair work themselves.
¶ 38. The service manual for the Scout articulated a wheel bearing replacement procedure. This procedure requires the Scout's repairer to remove the bearing retainer ring, located above the bearing on the axle shaft, by striking it with a cold chisel until it splits, while being careful to avoid damaging the axle shaft. Then, the manual instructs to remove the old bearing from the axle shaft with a puller tool, to inspect the surfaces of the axle shaft, and to clean the axle shaft and remove all nicks or burrs (deburring). Finally, the new bearing is to be installed by using a puller tool to press the bearing onto the axle shaft. A new retainer ring is also required.
¶ 39. Harris's metallurgical expert, Richard McSwain, testified by deposition that he inspected the Scout's axle, examined it under a microscope, and compared it with a prototype axle. He stated that the Scout's axle had snapped due to heat damage caused by friction from the bearing moving on the axle during the Scout's operation. McSwain testified that the bearing moved on the axle due to excessive deburring of the axle shaft that had occurred at the time the bearing was replaced. The excessive deburring reduced the diameter of the axle shaft, causing the bearing to fit inadequately around the axle shaft.[5] This inadequate fit caused the bearing to move on the axle during operation *1113 of the Scout, creating heat. McSwain observed that the service manual did not prescribe the proper diameter for the axle shaft or warn of the danger that too much deburring could cause the bearing to rotate on the axle, leading to the axle's failure. Also, the manual did not instruct the repairer to measure the axle shaft after deburring to ensure a proper diameter. McSwain opined that the service manual should have included this information and that the failure to include this information rendered the instructions inadequate.
¶ 40. McSwain further testified that the axle's physical condition was consistent with its having been repaired by someone following the International service manual. He stated that the Scout's left axle shaft had several marks located underneath the retainer ring. McSwain stated that these marks were consistent with someone having struck the axle shaft with a chisel while removing the retainer ring as instructed by the manual. He testified that someone following the manual's instructions to strike the retainer ring with a chisel would have had a difficult time refraining from accidentally striking through to the axle shaft. Harris's expert mechanic, Charlie Miller, agreed that it would be difficult to refrain from striking through to the axle shaft with the chisel.[6] Even International's expert, Cheek, acknowledged the presence of marks underneath the retainer ring, although he could not conclude that they had been made by a chisel. McSwain also testified that the axle shaft bore evidence of excessive deburring, which was consistent with someone having followed the manual and having deburred the axle shaft without measuring its diameter. There was expert testimony that the service manual would have been followed by a certified International mechanic repairing a Scout, evidence that a certain repair manual commonly used by "do-it-yourselfers" did not include bearing replacement instructions, and evidence that the service manual was available to Scout owners for their own use.
¶ 41. In my opinion, from this evidence, a jury reasonably could infer that it was more probable than not that someone following the instructions in International's service manual replaced the bearing, deburred the axle shaft, and excessively reduced its diameter, causing the accident. McSwain's testimony provided a basis for a jury finding that the instructions provided by the service manual were inadequate and rendered the Scout unreasonably dangerous. If the jury indeed concluded that the service manual's instructions were followed by the Scout's repairer, then the jury would have been entitled to find that adequate instructions likewise would have been followed had they been provided in the service manual. Wyeth Laboratories, Inc., v. Fortenberry, 530 So.2d 688, 691 (Miss.1988).
¶ 42. In Mack Trucks Inc. v. Tackett, 841 So.2d 1107, 1110(¶ 7) (Miss.2003), the plaintiff sought to show that one or both of two diesel truck engines caught fire due to overspeeding, resulting in an explosion and the death of a worker. Tackett could not show which truck's engine caught fire. Id. Expert witnesses vastly differed in their opinions as to the cause of the fire. Id. at 1111 (¶¶ 8-14). Tackett's mechanical engineering expert testified that the fire was *1114 caused when gasoline fumes were sucked into both trucks' engines, causing them to "overspeed" and become overheated, producing flames. Id. at (¶ 8). The defendants' experts found no evidence of overspeeding. Id. at 1111 (¶¶ 10-14). They offered several theories as to the cause of the fire, involving one or both of the trucks. Id. These included leaking fuel caused by the worker's negligence or a spark from an electrical system, from a hot engine, from a battery cable, or from exhaust parts. Id. The supreme court found that this "battle of the experts" over causation contained sufficient evidence to support the jury's verdict for Tackett. Id. at 1112(¶ 20). Thus, the jury was permitted to select among conflicting expert testimony and render a fact-finding as to the cause of the fire.
¶ 43. I consider the proof of causation in this case no less speculative than that adduced in Tackett. A metallurgical expert testified that the condition of the axle was consistent with its having been repaired according to the service manual's instructions and that the axle failed due to those instructions having been faulty. I believe that reasonable minds could differ as to whether the bearing replacement was done in accordance with International's service manual and caused the injuries of Harris and his brother. Therefore, I would find that this case presents a genuine factual dispute properly resolved by a jury. I respectfully dissent.
NOTES
[1] A Scout II is a vehicle similar in shape to a covered truck intended primarily for use as an off-road vehicle.
[2] For a fee, an owner could order a copy of the service manual directly from the manufacturer.
[3] In Reyes, however, the drug, two drops of Sabin oral polio vaccine, was not prescribed by a doctor but was administered by a nurse at the Hidalgo County Department of Health clinic in Mission, Texas. The vaccine was administered to an eight-month-old child without any warnings being given to the child's parents regarding the potential dangers of ingesting the vaccine, although a package circular, intended to warn doctors, hospitals, or other purchasers of the dangers of ingesting the vaccines, accompanied the vial containing the vaccine.
[4] Thomas specifically defines a "consumer" as "the person making the decision whether a product should be used or purchased." Thomas, 949 F.2d at 813, n. 28. The mechanic with access to the International service manual would obviously not be this person.
[5] The fit of the bearing to the axle shaft was referred to as the "interference fit" throughout the record.
[6] As recognized by the majority, Miller did state that a repairer could damage the axle by using a drill and punch or a Dremel tool as opposed to a chisel. But, contrary to the implication of the majority, Miller did not opine that the axle marks in this case could have been caused by a drill and punch or a Dremel tool. Rather, Miller deferred to McSwain for all metallurgical opinions. Thus, Miller's testimony did not contradict McSwain's, as stated by the majority.